Filed 12/11/15  In re M.E. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.E., a Person Coming Under the Juvenile Court Law. | D068148 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518405C) |
| v. | |
| T.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Daniela Davidian, Deputies County Counsel.

T.S. (Mother) appeals a juvenile court order terminating parental rights to her child, M.E. Mother contends the juvenile court erred in finding the beneficial parent-child relationship exception to adoption (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i)) did not apply and terminating parental rights. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

M.E., who was two years old at the time parental rights were terminated, is the child of Mother and D.E. (Father). The juvenile court terminated Mother's parental rights to M.E.'s half-siblings, B.P. and D.P., in August 2014.[2]

*Agency's Section 300 Petition*

In August 2013, the San Diego County Health and Human Services Agency (Agency) filed a dependency petition for then three-month-old M.E. The petition alleged M.E. was at substantial risk of serious physical harm because she and her half-siblings were exposed to violent confrontations between Mother and Father. (§ 300, subd. (b).) M.E.'s half-siblings were already dependents of the court due to domestic violence incidents between Mother and B.P. and D.P.'s father.

At an ensuing detention hearing, the juvenile court found Agency had made a prima facie showing that M.E. was a person described under section 300, subdivision (b)

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] Father does not appeal, and we do not discuss facts related to his rights. B.P. and D.P. are not parties to this appeal. The history of their dependency proceedings is detailed in our nonpublished opinion, *In re Brianna P.* (March 13, 2015, D066530).

and detained M.E. in a licensed foster home.  The court ordered Agency to provide liberal, supervised visitation.

In September 2013, the juvenile court placed M.E. in a licensed foster home and ordered services for Mother.  Mother's case plan required her to attend a domestic violence program, a parenting education program, and individual therapy.  When Mother finished breastfeeding, the court reduced her supervised visitation from four to two times a week.

In March 2014, a social worker reported that Mother's therapist, Estella Bobadilla, stated that Mother had not completed therapy or met her case plan goals.  Bobadilla felt Mother loved and had "amazing interaction" with her children, but she was unable to care for them.  According to Bobadilla, Mother did not have the emotional resources for a baby, nor could Bobadilla say Mother could parent, especially without family or support.  Bobadilla was concerned with Mother's inability to be empathic with her children, attraction to unhealthy relationships, and unstable housing situation.  She also expressed concern over Mother's mental health, as she exhibited manic states and signs of depression.  Agency recommended that Mother's services be terminated and that the matter be set for a section 366.26 hearing.

*March 2014 Section 366.21 Hearing*

At the contested six-month review hearing in March 2014, despite Agency's recommendations, the juvenile court found a substantial likelihood M.E. would be returned to Mother within the next six months and continued Mother's reunification

services to the 12-month review date. One month later, the juvenile court ordered a court appointed special advocate (CASA) for M.E.

In August 2014, M.E.'s CASA observed M.E.'s developmental skills had "soar[ed]" and that M.E. "clearly has a loving relationship with her foster parents and her siblings." The foster mother exposed M.E. to many activities and created an environment that enhanced M.E. and her half-siblings' play and growth, and the foster mother participated in M.E.'s weekly in-home sessions with her teacher. M.E. had undergone successful physical therapy while in her foster mother's care.

In September 2014, a social worker reported that Mother had confronted Father at a bus stop. Mother had not complied with her case plan or consistently participated in services, including parenting classes and domestic violence groups. Therapist Bobadilla reported she had neither seen nor heard from Mother since June 2014. Bobadilla told the social worker Mother did not have the "emotional stability" to be a parent. She concluded Mother did not understand the consequences of her domestic violence issues and could not be protective. During this time, Mother reported she had been homeless for four or five months and stayed with friends while she unsuccessfully sought room in shelters or transitional housing programs.

Despite these issues, the social worker noted Mother consistently visited M.E. on Mondays and Fridays, and acted appropriately by showing affection towards M.E., keeping an eye on her, redirecting her, and changing her diaper. However, the Friday visits were discontinued in July 2014 because Mother had eight absences or

4

cancellations.  M.E.'s caregiver reported M.E. cried and clung to her when M.E. left for visits.

In October 2014, a social worker reported that Mother had not re-engaged in her services; Mother reported she was experiencing "major depression," was tired of trying, and had lost hope.  Her housing situation remained unstable, and she failed to contact a housing program specialist for an interview.  The social worker concluded Mother's history of abuse, instability and neglect was likely to continue to interfere with her ability to parent M.E. and recommended termination of reunification services.

*October 2014 Twelve-Month Review Hearing*

At the contested 12-month review hearing, the juvenile court found Mother's failure to make substantive progress in her services was prima facie evidence of detriment.  Based on the history of domestic violence between Mother and Father, the court found Mother lacked the insight into domestic violence necessary to show the court she could safely parent and protect M.E.  Mother failed to demonstrate her capacity and ability to complete her case plan objectives and provide for M.E.'s protection, well-being, and needs.  The court terminated Mother's reunification services and set a section 366.26 hearing.

In February 2015, Agency social worker Alanna Chiler observed that M.E. had lived with her current caregivers since she was three months old.  She reported M.E. called her caregivers "mommy" and "papi" and sought comfort from them.  The caregivers were in the process of adopting M.E.'s half-siblings.  Chiler reported that Mother inconsistently participated in her case plan and visits, and continued to have

5

unstable housing. She observed Mother showed little insight into the significant impact that witnessing domestic violence had on her children. She noted Mother had failed to reunify with M.E.'s two older siblings, and exhibited a pattern of violent relationships and housing instability. She inconsistently participated in her services for M.E. Although M.E. appeared to enjoy visits with Mother, Chiler believed the relationship between M.E. and Mother did not rise to the level of a parent-child relationship. M.E. did not display any emotional distress when visits ended or when Mother failed to attend. M.E.'s caregivers consistently met her needs, and M.E. relied on them to meet her needs. Chiler concluded Mother's ability to meet M.E.'s needs during a two-hour visit did not indicate that she could do so if M.E. were placed back in her care. She recommended termination of Mother's parental rights and adoption as M.E.'s permanent plan.

In February 2015, M.E.'s CASA reported that the foster mother made M.E.'s placement "as nurturing as possible." M.E.'s two half-siblings were also placed in the home, and the caregivers showed willingness to adopt all three of the children. M.E.'s developmental skills continued to soar. The CASA attributed these developments to M.E.'s services and the foster mother's nurturing home environment. Mother missed two visits the CASA had planned to observe. Although M.E. enjoyed her visits with Mother, the CASA reported M.E. "continues to cry out for her foster mother" and the foster home "provides her a great sense of family and permanency." The CASA recommended termination of Mother's parental rights and adoption as the permanent plan.

In April 2015, Chiler reported additional visits she observed between M.E. and Mother. She acknowledged Mother's love for M.E. but compared Mother's interaction

6

with M.E. to a sibling or peer relationship. In contrast, M.E. looked to her current caregivers to meet her daily needs. Chiler opined adoption would provide M.E. the "emotional security, sense of family and stability" she needed. She concluded the enjoyment M.E. experienced from visits with Mother did not outweigh the benefits of adoption and recommended termination of parental rights and adoption.

M.E.'s CASA reported M.E.'s developmental progress had continued because of her services and the foster mother's nurturing home environment. The CASA observed M.E. was happy and excited about her activities. M.E.'s vocabulary grew, and her fine and gross motor skills appeared to be age appropriate. The CASA continued to recommend termination of parental rights and adoption as M.E.'s permanent plan.

In an addendum report filed on the day of the section 366.26 hearing, Chiler reported three additional visits that occurred in April 2015. Chiler reported M.E. eventually warmed up to and appeared to enjoy playing with Mother during the visits. Chiler acknowledged Mother helped M.E. wipe her nose, took her to the bathroom, and made sure she did not get hurt. However, she pointed out that Mother continued to struggle with her housing and her continuing unemployment. Chiler believed Mother was unable to care for M.E. because of the "instability in her life and unresolved trauma." As a result, she opined Mother had failed to mitigate the circumstances that brought M.E. to the juvenile court's attention. Chiler noted M.E. looked to her caregivers for all her needs and was thriving in her current home. She continued to recommend termination of parental rights and a permanent plan of adoption.

*Section 366.26 Hearing*

At the May 2015 section 366.26 hearing, the juvenile court accepted Agency's and the CASA's reports.[3] Agency also presented social worker Chiler as a witness. Chiler testified Mother did her best to maintain contact with M.E., who was then two years old. Chiler testified that she had observed at the last visit in May 2015 that, unlike previous visits with Mother, M.E. willingly went to the visit, walked up to Mother and recognized her as "mommy." Chiler noted that at times M.E. had refused to go and ran to her caregiver when it was time to go to visits.

Chiler testified that Mother took on a parental role during visits by ensuring M.E. did not hurt herself and taking her to the bathroom. However, Chiler clarified that a "parental role" meant a "responsible adult role." She pointed out that Mother had never progressed beyond supervised visits, and that other adults had taken on the same responsible adult role. According to Chiler, she herself took on a parental role by helping M.E. into her car seat, taking her to the bathroom, and ensuring her safety. Chiler testified that to determine whether the requisite parent-child relationship exists, she considers whether the child goes to the caregiver to get his or her needs met, how the child reacts to the caregiver or parent, how long the child has lived with the parent or caregiver, and the child's reaction after the visit. She testified there was a difference between taking on a parental role in a visit and having a parent-child relationship, and

_____

[3]     Specifically, those were Agency's February 18, 2015 section 366.26 report, February 18, 2015 addendum report, and April 20, 2015 addendum report, the CASA's April 14, 2015 report, and Agency's May 6, 2015 addendum report.

8

opined there was no parent-child relationship between M.E. and Mother. She based her opinion on the fact that M.E. had only lived with Mother for three months, lived with her caregiver for most of her life, looked to her caregiver to get all her needs met, had difficulties leaving the caregiver, and initiated affection with the caregiver after returning from visits. Chiler felt M.E. had developed a bond with her current caregiver, whom she viewed in a parental role. According to Chiler, apart from the May 2015 visit, M.E. would not recognize Mother as her mother. Other times, M.E. would wait for Mother to come up to her and neither reacted nor displayed any facial expression when she approached her.

Mother testified she was the only one caring for M.E. before M.E. was removed from her. She pointed out that at their last visit, M.E. came to the door and hugged her. Though M.E. could not speak, Mother felt she recognized her partly because she called her "mommy." Mother stated she acted as a parent by ensuring M.E. did not get hurt, washing M.E.'s hands after bathroom trips, telling her to say "please" and "thank you," and redirecting her behavior. She pointed out she brought clothes, toys, candy, food, and snacks for M.E. and her half-siblings, and redirected M.E. when she acted out.

Adopting the recommendations in Chiler's section 366.26 report, and considering the documents and testimony presented, the juvenile court found by clear and convincing evidence that M.E. was generally and specifically adoptable and likely to be adopted if parental rights were terminated, adoption was in M.E.'s best interests, termination of parental rights would not be detrimental to M.E., and none of the exceptions to adoption under section 366.26, subdivision (c)(1)(B) applied. The court acknowledged Mother

9

had regularly and consistently visited M.E., loved M.E., and took on a role as a responsible adult during visits, but found she did not have a parent-child bond that would override the benefits of adoption or cause detriment if the relationship was severed. The court based its finding on the fact Mother never progressed beyond unsupervised visits, she did not have full-time care of M.E. since M.E. was three months old, and the primary parents and caregivers in M.E.'s life were her licensed foster parents. The court terminated Mother's parental rights and referred M.E. for adoption.

Mother timely appealed.

## DISCUSSION

### I. *Legal Principles and Standard of Review*

This court recently summarized the relevant legal principles, including the applicable standard of review, in *In re Anthony B.* (2015) 239 Cal.App.4th 389: "At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include adoption. [Citations.] 'If the dependent child is adoptable, there is strong preference for adoption over the alternative permanency plans.' [Citations.] In order to avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. [Citations.] The court, 'in *exceptional circumstances,*' may 'choose an option other than the norm, which remains adoption.' [Citation.] The parental benefit exception applies when there is a compelling reason that the termination of parental rights would be detrimental to the child. This exception can

10

only be found when the parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).) We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.*, at p. 395.)

On our review of the sufficiency of the evidence, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

The determination of whether there is a compelling reason for finding termination of the relationship would be detrimental to the child is " ' "quintessentially" discretionary' " as it " 'calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption . . . .' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.) Thus, we will not disturb that decision unless the court has " ' "exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citations.] . . . 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two

11

or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

The beneficial parent-child relationship exception must be examined on a case-by-case basis, taking into account variables such as the "age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.) The parent asserting the exception will not meet his or her burden by showing the existence of a "friendly and loving relationship," an emotional bond with the parent, or pleasant, even frequent, visits. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529; *In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re L.S.* (2014) 230 Cal.App.4th 1183, 1200 ["To avoid termination of parental rights, it is not enough to show that a parent-child bond exists"].) There must be a parental role in the child's life, resulting in a significant, positive emotional attachment from the child to parent that if severed would result in harm to the child. (*In re C.F.*, at p. 555; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; see also *In re J.C.*, at p. 529 [observing that interaction between a natural parent and child will always confer some incidental benefit to the child and for the exception to apply, " 'a *parental* relationship is necessary' "].)

The " 'benefit' " necessary to trigger the exception requires that the relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being

the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 528-529, citing *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

II. *Substantial Evidence Supports the Juvenile Court's Finding Mother Did Not Have a Parent-Child Relationship with M.E.*

Because the juvenile court found M.E. was adoptable, it was Mother's burden to show termination of her parental rights would be detrimental under one of the section 366.26, subdivision (c)(1) exceptions. (*In re Anthony B.*, *supra*, 239 Cal.App.4th at p. 395.) Mother contends the juvenile court erred when it found the beneficial parent-child relationship exception did not apply.[4] In particular, pointing to Chiler's testimony and reports that Mother exhibited a "parental role" with M.E., she maintains substantial evidence does not support the court's finding that no parent-child relationship existed between her and M.E. The contention, however, ignores Chiler's detailed explanation concerning what she meant by the phrase "parental role," her testimony about the type of

---

[4]     Agency does not challenge the juvenile court's finding that Mother had regular visitation and contact with M.E. Mother does not challenge the court's finding that M.E. is adoptable.

13

parental relationship necessary to meet the exception, and her conclusion that Mother did not have the requisite parent-child relationship with M.S. The juvenile court was entitled to credit Chiler's assessments and conclusions. (*In re Casey D.* (1999) 70 Cal App.4th 38, 53; see also *In re T.W.* (2013) 214 Cal.App.4th 1154, 1162 [reviewing court defers to juvenile court's finding that the social worker's testimony was credible].) Chiler's reports and testimony alone constitute substantial evidence supporting the juvenile court's finding that the parent child-relationship exception was unmet.

As do many appellants in Mother's situation, Mother focuses on the evidence in her favor. She maintains that she and M.E. shared love and affection for each other, and had the type of relationship as the parent and child did in *In re S.B.*, *supra*, 164 Cal.App.4th 289. But in *In re S.B.*, unlike Mother here, the father "complied with 'every aspect' of his case plan" and placed the child's needs above his own. (*Id.* at p. 300.) Unlike here, where M.E. at times did not want to attend visits, easily separated from Mother at the visits' conclusion, and was neither sad nor upset when visits did not occur, the child in *In re S.B.* became upset when visits ended, and the social worker reported it pained Agency not to be able to reunify the father and his child. (*Id.* at p. 294.) A bonding study described the bond between the father and child as " 'fairly strong' or 'moderate,' " and the psychologist who conducted the study testified there was a potential for harm to the child if the relationship was severed. (*Id.* at pp. 295-296.) This court found that the child "would be greatly harmed by the loss of her significant, positive relationship" with her father, and that the juvenile court erred by declining to apply the beneficial parent-child relationship exception. (*Id.* at p. 301.)

14

We have repeatedly emphasized that *In re S.B.* must be "confined to its extraordinary facts" and "does not support the proposition a parent may establish the parent-child beneficial relationship exception merely by showing the child derives some measure of benefit from maintaining parental contact." (*In re C.F.*, *supra*, 193 Cal.App.4th at pp. 558-559; *In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) Here, there was no bonding study or other evidence indicating a strong or even moderate bond between Mother and M.E. Mother's reliance on *In re Amber M.* and *In re Brandon C.* is unpersuasive for similar reasons. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 690-691 [beneficial parent-child relationship exception applied where bonding study showed detriment if the relationship was severed and mother "did virtually all that was asked of her" to regain custody]; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1535-1537 [guardianship order upheld where the mother showed progress in services, the children looked forward to visits and initiated affection towards the mother, the children cried after visits ended, and the mother and appointed guardian testified there was a close bond between the mother and the children and the children would benefit from continued contact with the mother].)

III. *The Juvenile Court Did Not Abuse its Discretion in Finding Termination of Mother's Relationship with M.E. Did Not Outweigh the Benefits of Adoption or Would Cause Detriment if Severed*

Mother contends the benefits of continuing her relationship with M.E. outweigh the benefits of adoption, because she has been a constant in M.E.'s life, cared for her when she was young, continued to breastfeed her, and consistently visited her throughout

the case. Mother also asserts she shares a "common history" of domestic violence with M.E., and M.E. would benefit from the understanding that Mother did all she could at the time to protect M.E., ensure her safety, and maintain a parent-child relationship with her. Mother further argues she eliminated the risks that initially brought M.E. under the dependency system by ending her relationship with Father.

Even if Mother had shown a parental relationship with M.E., we cannot say the juvenile court abused its discretion by finding the relationship Mother had with M.E. neither outweighed the benefits of adoption nor would be detrimental to M.E. if severed. As stated, supervised visits are the sole basis for M.E.'s relationship with Mother, and M.E. has been in the care of her current caregivers for most of her life. Contrary to Mother's contention that she eliminated the risk of domestic violence, Agency reported Mother failed to mitigate the circumstances that made M.E. a dependant of the juvenile court. Mother did not make substantial progress in her reunification services intended to protect her from domestic violence, and Agency reported Mother could not be a protective parent and failed to understand how domestic violence impacted her children. During dependency proceedings, additional disputes occurred between Mother and Father. As stated, there is no bonding study or other evidence to show terminating Mother's relationship with M.E. would be detrimental to M.E. (§ 366.26, subd. (c)(1)(B)(i); accord, *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 533-534; *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.) Mother focuses on the wrong standard when she argues that *continuing* the relationship would *not be* detrimental to M.E.

16

In contrast, M.E. thrived in the "nurturing home environment" her caregivers provided, was bonded to them, and turned to them for comfort and her daily needs. She eagerly returned to them and was affectionate to them after visits, and the caregivers were committed to adopting her and her half-siblings. The court reasonably concluded Mother did not have a parent-child relationship that would override the benefits of adoption or would make termination of parental rights detrimental to M.E. For these reasons, the juvenile court did not abuse its discretion in finding the beneficial parent-child relationship exception to adoption did not apply.

DISPOSITION

The order is affirmed.


                                                                    O'ROURKE, J.

WE CONCUR:


HALLER, Acting P. J.


PRAGER, J.*

---

*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18